# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| DOUG RIFFE, | ) | CASE NO. 1:15CV889 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Doug Riffe ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

his applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This case is before the undersigned

United States Magistrate Judge pursuant to the consent of the parties entered under the

authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's

final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In June 2012, Plaintiff filed his applications for POD, DIB, and SSI, alleging a

disability onset date of December 17, 2007.  (Transcript ("Tr.") 22.)  The application was

denied initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id.*)  On September 6, 2013, an ALJ held Plaintiff's

hearing.  (Tr. 37- 60)  Plaintiff participated in the hearing, was represented by counsel,

and testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.  (*Id.*)  On

November 15, 2013, the ALJ found Plaintiff not disabled.  (Tr. 22-32.)  On March 23, 2015, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1-3.)

On May 5, 2015, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 16.)

Plaintiff asserts the following assignment of error: The ALJ erred at Step Four of the five-step evaluation process concerning determining residual functional capacity and Plaintiff's credibility.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in October 1959 and was 48-years-old on his alleged disability onset date.[1]  (Tr. 30.)  He had an 11th grade education and was able to communicate in English.   (Tr. 41.)  He had past relevant work as a carpet installer.  (Tr. 41, 56-57.)

### B.    Relevant Medical Evidence[2]

#### 1.    Medical Reports

On December 17, 2007, Plaintiff presented to the emergency room with complaints of severe chest pain, shortness of breath, nausea, and weakness.  (Tr. 288.)  At that time, he also reported suffering from chronic gastrointestinal ("GI") problems, "for

---

[1] Plaintiff was 53 years old on the date of the hearing and, therefore, changed age categories to closely approaching advanced age.  *See* 20 CFR 404.1563(d) and 416.963(d).

[2] As Plaintiff focuses his arguments on the ALJ's analysis of his abdominal pain, the Court will primarily discuss the medical evidence relating to that impairment.

which he has had no workup." (*Id.*)  Plaintiff was admitted to the hospital for increased cardiac enzymes and acute myocardial infarction.  (Tr. 286.)  After extensive testing, Plaintiff underwent cardiac catheterization and stenting.  (*Id.*)  He was prescribed various medications (including Atenolol, Lisinopril, Lipitor, Plavix, and aspirin) and discharged home after three days hospitalization.  (*Id.*)

In January 2008, Plaintiff underwent additional stenting procedures.  (Tr. 311-339.)  Several months later, in April 2008, Plaintiff underwent an ultrasound of his abdomen, which was unremarkable.  (Tr. 272-273.)  In October 2008, Plaintiff underwent an MRI of his lumbar spine, which showed mild positional levoscoliosis and degeneration at L4-L5 and L5-S1.  (Tr. 271.)

The parties do not direct this Court's attention to any medical records from 2009 to 2010 relating to Plaintiff's abdominal pain.  In February 2011, however, Plaintiff reported continuing abdominal pain with "no change in description or frequency," to an unknown physician at North Coast Health Ministry.  (Tr. 344.)  Plaintiff was subsequently referred by his primary care physician Philip Tomsik, M.D., to Metro's GI clinic for treatment with gastroenterologist Kiran Anna, M.D.   (Tr. 447.)

Plaintiff began treatment with Dr. Anna on July 7, 2011.  (Tr. 447-452.)  Plaintiff reported chronic abdominal pain for the last 20 years, which he described as follows: "comes and goes, no precipitating factors, wakes up in sleep at times, [feels like] a squeeze in the epigastric region, lasting from a few minutes []up to days, localized, non radiating, not clearly related or changed by food."  (Tr. 447)  He stated the pain had been getting worse "over the years," and he had tried various medications (Prilosec, Nexium, and Zantac) but "nothing worked."  (*Id.*)  On examination, Dr. Anna noted

3

Plaintiff's abdomen was soft with no tenderness, guarding, or rigidity.  (Tr. 449.)  He assessed chronic abdominal pain and postponed developing a treatment plan until obtaining Plaintiff's previous medical records.  (*Id.* )

On July 22, 2011, Plaintiff presented to cardiologist Mahi Ashwath, M.D., for follow up of his coronary artery disease.  (Tr. 441- 446.)  Dr. Ashwath noted Plaintiff had not experienced further cardiac episodes since his 2007 hospitalization and was "reasonably active – no symptoms with walking 3 miles recently."  (Tr. 441.)  Plaintiff did report GI problems, however, including epigastric pain and nausea with "no aggravating or relieving factors."  (*Id.*)  On examination, Plaintiff's abdomen was soft and nontender.  (Tr. 443.)  Dr. Ashwath assessed coronary artery disease, noting that Plaintiff had "no symptoms to his chest since stents[,] [h]owever, would be hard to tell if his epigastric symptoms are related to his heart."  (Tr. 444.)

Plaintiff returned to Dr. Anna on July 28, 2011, with reports of continuing, worsening abdominal pain.  (Tr. 434-440.)  Dr. Anna noted mild epigastric tenderness with no guarding or rigidity.  (Tr. 435.)  He noted that "[w]e have not yet received [Plaintiff's] old records documenting prior investigation."  (*Id.*)  Dr. Anna documented a continuing attempt to get Plaintiff's records but, "[i]n the meanwhile, based on what he tells us, [we] will investigate him for rare causes of abdominal pain such as connective tissue disorders, heavy metals poisoning, porphyriam, etc."  (*Id.*)  Dr. Anna ordered blood work and referred Plaintiff to a pain clinic. (*Id.*)

On August 5, 2011, Plaintiff presented to the emergency room after lab results indicated high levels of potassium.  (Tr. 419-432.)  Plaintiff reported experiencing chronic abdominal pain with nausea for the past 15 years, which he described as sharp,

4

intermittent, and occurring 6-7 times per day.  (Tr. 421.)  The attending physician noted

some tenderness in Plaintiff's epigastric region with no distension and normal bowel

sounds.  (Tr. 422.)  Plaintiff was assessed with hyperkalemia (elevated potassium) due

to Lisinopril, and possible renal failure.  (*Id.*)  He was treated with Zolfran and Tylenol

and advised to discontinue Lisinopril.  (*Id.*)

On August 12, 2011, Plaintiff presented to Dr. Anna for follow-up treatment.  (Tr.

408-410.)  Plaintiff indicated he was previously on aspirin 325 mg and after reducing it

to 81 mg "has been feeling much better."  (Tr. 408.)  On examination, Plaintiff's

abdomen was soft with no tenderness, guarding, or rigidity.  (Tr. 409.)  Dr. Anna

assessed "possible aspirin induced gastritis which has resolved/resolving," and

discharged Plaintiff from the GI Clinic.  (*Id.*)

Thereafter, on September 21, 2011, Plaintiff presented to Rama Dilip Gajulapalli,

M.D., with complaints of "sharp spasms of pain in the epigastrium" lasting for a few

minutes.  (Tr. 403-406.)  Dr. Gajulapalli assessed non-specific abdominal pain and

prescribed Bentyl on an as-needed basis.  (Tr. 405.)

Plaintiff returned to Dr. Anna on October 20, 2011.  (Tr. 387-392.)  He reported

continuing abdominal pain and an inability to tolerate Bentyl due to extensive heartburn.

(Tr. 388.)  Dr. Anna recommended additional cardiac testing and blood work, and

assessed probable functional dyspepsia.[3]  (Tr. 389.)  Several months later, on March 2,

---

[3] Dyspepsia is an "impairment of the power or function of digestion; usually
applied to epigastric discomfort following meals."  Dorland's Illustrated Medical
Dictionary (30th ed. 2003).  Functional dyspepsia ("FD") is a "heterogeneous
disorder; in other words, a variety of causes can lead to similar symptoms."  *See*
http://www.iffgd.org.  "While the definition of FD has changed somewhat over the
years, the disorder is generally regarded as a group of symptoms thought to

2012, Plaintiff presented to Dr. Ashwath for "cardiac workup prior to GI workup."  (Tr. 380-385.)  Plaintiff underwent additional cardiac testing (including a stress test and cardiac catheterization), after which Dr. Ashwath determined that "patient can undergo necessary GI workup at this time [as] a cardiac etiology for the abdominal pain has been ruled out."  (Tr. 364, 492.)

On March 30, 2012, Plaintiff presented for an urgent care visit with internal medical resident Daniel Silbiger, D.O., complaining of intermittent episodes of sharp pain in the epigastric region.  (Tr. 367-371.)  Dr. Silbiger noted Plaintiff was not compliant with antacids or proton pump inhibitor ("PPI").  (Tr. 367.)  He ordered an esophagogastroduodenoscopy ("EGD") and recommended Plaintiff restart antacids and the PPI.  (Tr. 368.)

Plaintiff underwent an EGD on April 9, 2012, which revealed normal findings with an incomplete Schatzki ring found in the esophagus.[4]  (Tr. 489-490.)  Dr. Anna reviewed the results and noted "no endoscopic abnormality seen to explain abdominal pain; abdominal pain likely functional."  (Tr. 490.)  Plaintiff returned to Dr. Anna on May 3, 2012 and reported that "[s]ince last 6 months [he] continues to have the same abdominal pain: no better no worse."  (Tr. 482.)  Examination revealed mild epigastric tenderness with no guarding or rigidity.  (Tr. 483.)  Dr. Anna found that Plaintiff's history

---

originate in the upper disgestive tract (stomach and upper small intestine) in the absence of any structural or metabolic disease likely to explain the symptoms."  *Id.*  The causes of FD "are largely unknown and likely multiple."  *Id.*

[4] A Schatzki ring is "an annular constriction of the lower esophagus, usually at the junction of the esophageal and gastric mucosa."  Dorland's Illustrated Medical Dictionary (30th ed. 2003).

6

suggested "he probably has functional dsypepsia."  (Tr. 484.)  He prescribed a trial of

Trazodone and ordered a CT study of Plaintiff's abdomen.  (*Id.*)

Plaintiff thereafter underwent a CT of his abdomen/pelvis, which was compared

to a previous CT study in 2007.  (Tr. 486-487.)  The CT revealed the following:

> No CT evidence of acute intra-abdominal process.  The findings in the
> sigmoid colon probably reflect chronic diverticulosis, although mucosal
> lesions such as polyps in these areas may not be detectable with CT
> scan.
>
> A small 5 mm hypodense lesion in the head of the pancreas is slightly
> larger since the 2007 comparison.  This lesion is too small to characterize
> and differential diagnosis may include a slowly growing neoplasm such as
> IPMN of a side branch of the main pancreatic duct.  Consider further
> evaluation with MRCP in view of the provided clinical information.
>
> Bilateral small adrenal masses are unchanged and likely represent benign
> adrenal adenomas.

(Tr. 487.)

On May 30, 2012, Plaintiff presented to Dr. Tomsik, reporting that "[a]fter

extensive work up, still gets abdominal pain intermittently – several times a day."  (Tr.

352, 547.)   On examination, Dr. Tomsik noted tenderness in Plaintiff's abdomen.  (Tr.

352, 548.)  He assessed chronic abdominal pain of unclear etiology and recommended

a work up for pancreas abnormality.  (Tr. 353, 549.)

Plaintiff returned to Dr. Anna on August 31, 2012.  (Tr. 509-511.)  Dr. Anna noted

that Plaintiff had stopped taking both Nexium and Trazadone, and was now complaining

that his pain was worse after meals.  (Tr. 509.)  Abdominal examination revealed no

tenderness, guarding, or rigidity.  (Tr. 511.)  Dr. Anna found the "most likely cause of

chronic abdominal pain is functional dyspepsia," and advised Plaintiff to continue

Nexium and undergo a sublingual Levsin trial, a CT of his abdomen to evaluate

progression of his pancreatic mass, and a gastric emptying study to rule out gastroparesis.  (*Id.*)  The CT study (performed on September 10, 2012) revealed a stable pancreatic lesion of unclear etiology; stable small adrenal masses; and mild thickening of the proximal jejunum of unclear etiology.  (Tr. 514-515.)  The gastric emptying study revealed minimal delay.  (Tr. 513-514.)

Plaintiff returned to Dr. Anna on January 10, 2013.  (Tr. 524-526.)  He reported no change in his abdominal pain since the last visit, noting in particular that he had not experienced any relief from Nexium, Levsin, Trazadone, Reglan, or the PPI.  (Tr. 524, 526.)  Dr. Anna assessed functional dyspepsia and advised Plaintiff to continue Nexium; add Elavil at night; consider cognitive behavioral therapy and a psychiatric referral for chronic pain; and undergo another CT scan of his abdomen to evaluate progression of his pancreatic mass.  (*Id.*)

On February 8, 2013, Plaintiff presented to the emergency room with complaints of chest pain, shortness of breath, and nausea.  (Tr. 575-576.)  He was admitted to the hospital, after which he developed diarrhea and "generalized malaise."  (Tr. 583.)   After extensive testing and blood work, Plaintiff was assessed with (among other things) chest pain and viral gastroenteritis.  (Tr.  576, 582-583.)  He was hospitalized for three days and discharged with instructions to follow up promptly with his primary care physician and cardiologist.  (Tr. 576.)

On February 20, 2013, Plaintiff presented to Dr. Tomsik for follow-up, at which time he complained of "ongoing stomach issues."  (Tr. 544.)  In addition, in a depression screening conducted that date, Plaintiff reported that, on "more than half the days," he had little or no interest or pleasure in doing things; had trouble falling or staying asleep

8

or sleeping too much; felt tired or had little energy; felt bad about himself or that he is a failure or let himself down; and had trouble concentrating on things, such as reading the newspaper or watching television.  (Tr. 545.)  He also reported that these problems made it "somewhat difficult" for him to do his work, take care of things at home, or get along with people.  (Tr. 546.)  Plaintiff provided similar responses during a depression screening with Dr. Tomsik on May 22, 2013.  (Tr. 541-543.)

### 2. Agency Reports

#### a. Physical Impairments

On August 22, 2012, state agency physician Elaine Lewis, M.D., reviewed Plaintiff's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 85-87.)  Dr. Lewis opined Plaintiff could (1) lift and/or carry 20 pounds occasionally and 10 pounds frequently; (2) stand and/or walk for a total of about 6 hours in an 8 hour workday; (3) sit for a total of about 6 hours in an 8 hour workday; (4) frequently kneel, crawl, and climb ramps and stairs; and (5) occasionally stoop, crouch, and climb ladders, ropes, and scaffolds.  (Tr. 85-86.)  She also concluded Plaintiff had an unlimited capacity to balance and to push and/or pull.  (*Id.*)  Finally, Dr. Lewis found that Plaintiff should avoid concentrated exposure to extreme cold and heat.  (Tr. 86.)

Thereafter, on November 24, 2012, State agency physician Esberdado Villanueva, M.D., reviewed Plaintiff's medical records and completed a Physical RFC Assessment.  (Tr. 106-108.)  Dr. Villanueva reached the same conclusions as Dr. Lewis regarding Plaintiff's physical functional limitations.  (*Id.*)

9

### b.    Mental Impairments

On November 2, 2012, Plaintiff underwent a consultative examination with Mitchell Wax, Ph.D.  (Tr. 517-521.)  He reported no prior psychiatric care or hospitalizations.  (Tr. 518.)  Plaintiff appeared disheveled and anxious, and described his mood as depressed.  (Tr. 519.)  He reported crying spells twice a week and stated that "sometimes I think of hurting myself."  (*Id.*)  He complained repeatedly of stomach problems, stating that the "doctors can't find a reason."  (*Id.*)  Dr. Wax found Plaintiff difficult to interview, observing "there was evidence of mental confusion as he often did not answer directly and he was often vague and circumstantial."  (Tr. 520.)  Dr. Wax found "an oddness" about Plaintiff and described him as isolated and depressed.  (*Id.*)

Dr. Wax diagnosed major depression and personality disorder, and assessed a Global Assessment of Functioning ("GAF") of 51.[5]  (Tr. 520.)  He concluded Plaintiff (1) is able to understand and follow directions, live independently, and take care of himself; (2) has difficulty maintaining attention and concentration and cannot perform simple and multi-step tasks on a consistent basis; (3) cannot respond appropriately to coworkers and supervisors; and (4) cannot respond appropriately to work pressures in a work setting.  (Tr. 521.)

On November 13, 2012, state agency psychologist Caroline Lewin, Ph.D.,

---

[5] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

10

reviewed Plaintiff's medical records and completed a psychiatric review technique and a

mental RFC assessment. [6]  (Tr. 105, 108-110, 118, 121-123.)  Dr. Lewin evaluated

Plaintiff's mental impairments under Listing 12.04 Affective Disorders and Listing 12.08

Personality Disorders and found he had a mild restriction of activities of daily living; mild

difficulties in maintaining social functioning; moderate difficulties in maintaining

concentration, persistence or pace; and no repeated episodes of decompensation.  (Tr.

105, 118.)  In the Mental RFC Assessment, Dr. Lewis opined Plaintiff was moderately

limited in his ability to respond appropriately to changes in the work setting, finding that

"[t]he claimant is capable of working in a predictable environment with infrequent

changes."  (Tr. 110, 123.)  In all other categories, Dr. Lewis found Plaintiff was "not

significantly limited" or there was "no evidence of limitation." (Tr. 108-110, 121-123.)

**C.    Hearing Testimony**

**1.    Plaintiff's Hearing Testimony**

During the September 6, 2013 hearing, Plaintiff testified to the following:

- He has an 11th grade education.  He is single and lives by himself in an apartment.  (Tr.  41, 45, 55.)  He has never been married and has no children.  (Tr. 55.)  He has a driver's license and is able to drive.  (Tr. 42.)

- His last job was as a self-employed carpet installer.  (Tr. 41.)  This was very heavy work that involved carrying carpet into houses, moving furniture, and installing carpet padding.  (Tr. 42.)

- He is unable to work because of the combined effect of his back, neck, knee, and abdominal pain.  (Tr. 42, 44.)  His abdominal pain started approximately 20 to 25 years ago, and has been getting progressively worse.  (Tr. 43)  He has episodes of debilitating abdominal pain six to

---

[6] Dr. Lewin's opinions are limited to the period August 2, 2012 to November 13, 2012. (Tr. 105, 108, 118, 121.)

11

eight times per day during which he "can't do or focus on anything."  (*Id.*)
These episodes are entirely unpredictable.  (Tr. 43.)  When they occur,
he experiences pain and nausea.  (Tr. 48-49.)  He rated the pain an eight
on a scale of ten.  (Tr.  49-50.)

- He has been taking medication for his abdominal pain but "nothing
  helps."  (Tr. 43.)  His doctor says he will have to learn to live with the
  pain because "they haven't been able to figure out what is going on with
  it."  (*Id.*)

- His back, neck and knee pain limits his ability to lift, walk, and stand.  (Tr.
  44-45.)  At most, he can lift 20 to 25 pounds.  (Tr. 44.)  He does not think
  he could walk a mile without pain.  (*Id.*)  He believes he could walk
  around the block, if he were able to take a break.  (*Id.*)  Standing is
  worse than walking.  (Tr. 45.)  He can stand for approximately 15
  minutes before experiencing pain.  (Tr. 44-45.)  He can climb one flight of
  stairs.  (Tr. 45.)

- He rated his average back pain an eight on a scale of ten.  (Tr. 50.)  He
  has "bad back episodes" two to three times per month lasting a couple of
  hours.  (Tr. 50-51.)  During these episodes, he cannot lift or walk.  (*Id.*)
  There are no known triggers for his back pain.  (Tr. 51.)  He is currently
  getting injections, but they have not been effective.  (Tr. 52.)  He
  underwent physical therapy, but it did not help.  (*Id.*)  His back condition
  is not getting better.  (Tr. 52-53.)

- He also has coronary artery disease, as a result of which he has had five
  stents surgically implanted.  (Tr. 53.)  At least once per week, he has an
  episode where he feels like "a cell phone on vibrate [is] going off" in his
  chest.  (*Id.*)  It stops "after awhile," but it "freaks [him] out."  (Tr. 53-54.)

- On a typical day, he watches television, reads magazines, and
  occasionally runs small errands.  (Tr. 46-48.)  He vacuums two to three
  times/ year and washes dishes "from time to time."  (Tr. 45-46.)  He
  microwaves prepared meals for himself.  (Tr. 46.)  He visits with his
  mother and brothers every couple of weeks.  (Tr. 47.)  He does not have
  any friends and does not go to the movies or to restaurants.  (*Id.*)  He
  does not go to church and does not belong to any organizations.  (*Id.*) He
  admitted that he isolates himself "a little."  (Tr. 54.)

### 2.    Vocational Expert's Hearing Testimony

The ALJ found Plaintiff had past relevant work as a carpet installer.  (Tr. 56.)

The VE characterized this job as heavy and skilled with an SVP of 7.  (Tr. 57.)  The ALJ

12

then posed the following hypothetical:

> All right. And if you would consider a person of the claimant's age,
> education, and past relevant work experience with the capacity for light
> work.  Who could climb ramps and stairs frequently, but never climb
> ladders, ropes or scaffolds.  Who could stoop occasionally.  Kneel, crouch,
> and crawl occasionally.  But who would have to avoid concentrated
> exposure to extremes of heat and cold.  And who has the capacity to work
> in a predictable environment with infrequent changes.  Could such a
> person perform the work the claimant performed in the past?

(*Id.*)  The VE testified the hypothetical individual could not perform Plaintiff's past work,
but could perform such representative jobs as housekeeper/cleaner (DOT 323.687-014)
(light, unskilled); laundry or garment folder (DOT 369.687-018) (light, unskilled); and
parking lot cashier (DOT 211.462-010) (light, unskilled).  (Tr. 57-58.)

Plaintiff's attorney then posed a second hypothetical that was the same as the
first except it limited Plaintiff to occasional climbing of ramps and stairs; no contact with
the public; and less than occasional (i.e., no more than 10%) contact with coworkers
and supervisors.  (Tr. 58.)  The VE testified such an individual would not be able to
perform Plaintiff's past work but could perform the housekeeper/cleaner and laundry or
garment folder jobs.  (*Id.*)

Plaintiff's attorney then asked whether employment would be available for an
individual that is off task 15% or more of the work shift on a regular basis.  (Tr. 58-59.)
The VE testified as follows: "I believe if you're off task 15 percent, that's about an hour
out of an eight hour workday. You're not going to be able to keep up and complete the
duties of the job.  And you would not be able to keep a job because of that."  (Tr. 59.)
Finally, Plaintiff's attorney asked "if that same hypothetical worker were to miss work
two or more days per month on a regular basis, would that hypothetical worker be able

13

to maintain employment?" (*Id.*)  The VE testified that "one day, once per month absenteeism unscheduled and not approved . . . would be work preclusive." (*Id.*)

### III.   STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if

14

the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2013.

2.    The claimant has not engaged in substantial gainful activity since December 17, 2007, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.    The claimant has the following severe impairments: ischemic heart disease, degenerative disc disease, affective disorder, and a personality disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: the claimant can climb ramps and stairs frequently but never climb ladders, ropes and scaffolds; occasionally stoop, kneel, crouch and crawl; he must avoid concentrated exposure to extremes of heat and cold; and he has the capacity to work in a predictable environment with infrequent changes.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on October 10, 1959 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

(Tr. 22-32.)

## V.  LAW & ANALYSIS

### A.      Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

16

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.      Plaintiff's Assignment of Error**

Although styled as a single assignment of error, Plaintiff presents two separate arguments in support of his assertion that the ALJ erred in finding him not disabled. Plaintiff first challenges the ALJ's RFC determination, arguing "the ALJ's step four determination regarding Mr. Riffe's RFC did not consider his abdominal impairment in any meaningful way."  (Doc. No. 14 at 14-15.)  Plaintiff then asserts the ALJ's credibility analysis is flawed because the decision "does not contain sufficient reasons for discounting Mr. Riffe's credibility and the reasons given are not supported by substantial evidence."  (*Id.* at 13.)  The Court will address these arguments separately, below.

**1.  RFC Determination**

Plaintiff argues the ALJ failed to properly account for his abdominal pain when formulating the RFC.  He asserts, without further elaboration, that "multiple symptoms and limitations were ignored."  (Doc. No. 14 at 15.)

17

The Commissioner maintains the ALJ properly considered Plaintiff's abdominal pain, noting that "the ALJ questioned Plaintiff regarding his abdominal issue at the hearing, specifically discussed Plaintiff's abdominal impairment in the decision, and cited to the relevant evidence in the medical record." (Doc. No. 16 at 7.)  She argues the ALJ reasonably found Plaintiff's abdominal impairment was non-severe and did not require accommodation in the RFC. (*Id.*)  The Commissioner also notes Plaintiff has not presented any medical or opinion evidence demonstrating his abdominal impairment caused limitations beyond those incorporated into the RFC. (*Id.*)

RFC is an indication of a claimant's work-related abilities despite his limitations. *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.945(e).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.945(a), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.  While RFC is for the ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, at step two, the ALJ determined Plaintiff had the severe impairments of ischemic heart disease, degenerative disc disease, affective disorder, and personality disorder. (Tr. 24.)  The ALJ concluded Plaintiff's stomach condition was non-severe, explaining as follows:

> The claimant alleges a stomach condition that prevents him from performing basic work activities.  The pain has been described as a "crampy-type discomfort" or a "squeeze" lasting a few minutes and that

18

has persisted off and on for 20 years.  (Exh. 3F pp. 10, 30, 46).  An ultrasound of the claimant's abdomen dated April 30, 2008 was unremarkable (exh. 1F p.9).  The claimant complained of abdominal pain episodes on February 16, 2011, but there is no indication that his pain resulted in a limitation of functioning (exh. 2F pp 5-6).  In July 2011, Kiran Anna, M.D., diagnosed the claimant as having abdominal pain (exh. 3F pp. 78, 91-92).  In August 2011, the pain was attributed to aspirin use, however, it returned the following month (exh. 3F p. 32, 52).

The claimant complained of increasing abdominal pain, without functional limitations, throughout 2012 (exhs. 3F, 5F).  An April 9, 2012 Mallampati Airway Assessment revealed no functional endoscopic abnormality that would explain the claimant's abdominal pain (exh. 3F, p. 133).  On May 8, 2012, Jemangi Kale, M.D., suspected that the claimant has functional dyspepsia, however this has not been confirmed with testing (exh. 3F, p. 127).  A May 3, 2012 CT showed a hypodense lesion on the pancreas consistent with follow-up imaging dated September 12, 2012 (exhs. 3F p. 130, 5F pp. 10-11).  A May 30, 2012 treatment note by Philip E. Tomsik, M.D., indicate that the claimant is being followed for an abnormality of the pancreases (exh. 2F p. 13).  The claimant described his pain as intermittent, and stated his bowel movements were generally ok.  Dr. Tomsik diagnosed the claimant as having abdominal pain, chronic, epigastric of an unclear etiology (exh. 2F p. 14).  A gastric emptying study dated September 12, 2012 showed minimally delayed to normal gastric emptying (exh. 5F p. 10).  Testing is consistently within normal limits, and examinations show no more than mild tenderness (exhs 3F, 9F, 10F).  Accordingly, the claimant's abdominal pain results in no more than a minimal limitation of functioning.

(Tr. 25.)

The ALJ continued through the sequential evaluation process and, at step four, determined Plaintiff had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except "the claimant can climb ramps and stairs frequently but never climb ladders, ropes and scaffolds; occasionally stoop, kneel, crouch and crawl; he must avoid concentrated exposure to extremes of heat and cold; and he has the capacity to work in a predictable environment with infrequent changes." (Tr. 27.)  In formulating this RFC, the ALJ expressly noted "the claimant testified he is

unable to work due to the combined limiting effects of back pain, stomach pain, and difficulty focusing."  (Tr. 28.)  The ALJ further noted that "[a]lthough the claimant alleges limitations due to abdominal pain, testing shows no functional limitations."  (Tr. 29.)

As a preliminary matter, to the extent Plaintiff is asserting the ALJ erred in finding his abdominal impairment to be non-severe at step two, the Court finds any error in this regard is harmless.  Although the determination of severity at the second step of a disability analysis is a *de minimis* hurdle in the disability determination process, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988), the goal of the test is to screen out totally groundless claims, *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  Once an ALJ determines that a claimant suffers a severe impairment at step two of his analysis, the analysis proceeds to step three; accordingly, any failure to identify other impairments or combinations of impairments as severe would be only harmless error because step two would be cleared.  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.").  Here, although the ALJ found Plaintiff's abdominal impairment was not a severe impairment, he determined Plaintiff's heart condition, degenerative disc disease, affective disorder, and personality disorder did constitute severe impairments.  (Tr. 24.)  Accordingly, Plaintiff cleared step two of the analysis, and any argument that the ALJ erred at step two is of no consequence. *See Anthony*, 266 F. App'x at 457.

20

The Court further finds the ALJ properly considered Plaintiff's abdominal impairment in formulating the RFC.  Despite Plaintiff's assertions to the contrary, the ALJ did consider Plaintiff's stomach pain at step four.  The ALJ noted Plaintiff's hearing testimony that he is unable to work due (in part) to his stomach pain, but found that medical testing did not reveal any functional limitations relating to this condition.  (Tr. 28, 29.)  The ALJ's finding is supported by substantial evidence in the record.   As noted previously, clinical examinations consistently noted no more than mild epigastric tenderness and, in fact, frequently noted no evidence of abdominal tenderness, guarding or rigidity.  (Tr. 449, 443, 435, 422, 409, 483, 352, 511.)   Plaintiff's April 2008 abdominal ultrasound, April 2012 EGD, and September 2012 gastric emptying study were all normal.  (Tr. 272-273, 489-490, 513-514.)  Moreover, Plaintiff acknowledges that cardiology testing and repeated abdominal CT scans in 2012 "did not reveal any significant abnormalities."  (Doc. No. 14 at 17.)

Finally, Plaintiff does not adequately explain in what respect the RFC fails to accommodate his abdominal pain.  The RFC expressly limits Plaintiff to light work with additional postural restrictions, including limiting him to occasional stooping, kneeling, crouching and crawling; frequent climbing of ramps and stairs; and never climbing ladders, ropes and scaffolds.  (Tr. 27.)  Plaintiff does not articulate any specific, additional restrictions that he believes should have been included in the RFC due to his abdominal pain.  Moreover, he does not direct this Court's attention to any medical opinion in the record that identifies specific functional limitations relating to his abdominal impairment.

Accordingly, and for all the reasons set forth above, the Court rejects Plaintiff's

21

argument that the ALJ failed to properly consider Plaintiff's abdominal impairment in formulating the RFC.  This assignment of error is without merit.

### 2.  Credibility

Plaintiff argues the ALJ did not provide sufficient reasons for discounting his credibility and, further, that the reasons given are not supported by evidence in the record.  (Doc. No. 14 at 13.)  Specifically, he maintains the ALJ failed to consider the medical evidence and testimony regarding his abdominal condition when assessing his credibility.   Plaintiff argues that "[t]hough each of the factors outlined in [SSR] 96-7p need not be addressed, the ALJ's failure to discuss any of them as they related to Mr. Riffe's abdominal condition renders her credibility analysis deficient." (*Id.* at 17.)

The Commissioner asserts "the ALJ was not required to perform a separate credibility analysis for each of Plaintiff's severe and non-severe impairments." (Doc. No. 16 at 9.)  Regardless, the Commissioner argues the ALJ did, in fact, consider Plaintiff's complaints of abdominal pain and related medical evidence in assessing credibility. She argues substantial evidence supports the ALJ's determination that Plaintiff's allegations of disabling abdominal pain were not fully credible.

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment.  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms."  SSR 96-7p.

Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *See* *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. *Id.*  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See* *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See* *Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight." SSR 96-7p, Purpose section; *see also* *Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* SSR 96–7p, Purpose.  Beyond medical evidence, there

are seven factors that the ALJ should consider.[7]  The ALJ need not analyze all seven

factors, but should show that he considered the relevant evidence.  *See Taynor v.*

*Colvin,* 2014 WL 2580085 at * 18 (N.D. Ohio June 9, 2014) (White, M.J.);  *Masch v.*

*Barnhart,* 406 F.Supp.2d 1038, 1046 (E.D. Wis. 2005).

Reading the decision as a whole, the Court finds the ALJ properly evaluated

Plaintiff's credibility.   At step two, the ALJ thoroughly discussed Plaintiff's abdominal

impairment, including the duration, frequency, and intensity of his pain; the extensive

diagnostic testing undertaken to determine the cause of this impairment; and the

diagnoses and clinical examination findings relating to this condition.  (Tr. 25.)  Later, at

steps three and four, the ALJ considered Plaintiff's statements regarding his daily

activities, including his abilities to perform household chores, live independently, drive,

and walk up to three miles per day.  (Tr. 26-29.)  The ALJ also considered, at step four,

Plaintiff's hearing testimony that he was unable to work due to his stomach pain.[8]  (Tr.

---

[7]  The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 96–7p, Introduction.

[8]  Plaintiff cites no legal authority for the proposition that this Court's review of an ALJ's credibility determination is confined to the ALJ's discussion of the evidence at step four.  Moreover, the Court can discern no reasoned basis for ignoring the decision as a whole when evaluating an ALJ's credibility analysis.  The key issue is whether the ALJ considered all the relevant evidence in assessing a claimant's credibility. The fact that an ALJ may discusses that evidence at various steps in the sequential evaluation is immaterial.

28.)

After considering the above evidence, the ALJ determined that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  (Tr. 28.)  The ALJ then articulated several reasons for discounting Plaintiff's allegations of disabling abdominal pain, including the fact that (1) testing was "consistently within normal limits" and showed "no functional limitations," and (2) clinical examinations showed "no more than mild tenderness."  (Tr. 25, 29.)  As discussed *supra*, these reasons are supported by substantial evidence in the record.  It also appears the ALJ considered Plaintiff's daily activities in assessing his overall credibility, including his ability to perform household chores, care for himself, and stay "reasonably active."  (Tr. 25, 28.)  Plaintiff does not argue the ALJ erred in relying on these daily activities in assessing his credibility.

While Plaintiff urges the Court to find that the reasons given by the ALJ do not demonstrate a lack of credibility, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).  *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")  The ALJ provided sufficiently specific reasons for her credibility

25

determination and supported those reasons with reference to specific evidence in the record.  Plaintiff's argument to the contrary is without merit.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: April 21, 2016